IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 24-cr-00113-NYW

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     CARIE L. HALLFORD,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Tim Neff and Craig G. Fansler, Assistant United States Attorneys for the District of Colorado, and the defendant, Carie L. Hallford, personally and by counsel, Robert Charles Melihercik, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.   AGREEMENT

### A. Defendant's Agreement:

The defendant agrees:

(1)    To plead guilty to Count 11 of the Indictment charging Conspiracy to Commit Wire Fraud in violation of Title 18, U.S.C., § 1349;

(2)    To waive certain appellate and collateral attack rights, as explained in detail below;

(3)    With the below projected calculations (part VI) under the U.S. Sentencing Guidelines;

1

COURT EXHIBIT
1

(4)    Not to seek—by variance or departure—a sentence less than the low-end of the applicable guideline range as determined herein;

(5)    That the Government will seek an upward departure and/or an upward variance above the applicable guideline range up to 15 years of imprisonment and will present evidence at sentencing in support of any such request;

(6)    To pay restitution in an amount ultimately determined by the Court at sentencing. The Defendant further agrees that any restitution would be jointly and severally owed along with the co-defendant (Jon Hallford) should the co-defendant also be found liable for the same offense conduct;

(7)    Not to contest forfeiture as more fully described below; and

(8)    To request and/or not oppose efforts by the Government to have the sentencing hearing occur first within the instant federal case before proceeding to any sentencing hearing in the related state court case pending in *Colo. v. Carie Hallford*, Case No. 2023CR4856, El Paso Co. District Court, Colorado.

**B. Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (C). The parties agree that a sentencing range of not less than the low-end of the Guidelines as calculated herein and not more than 15 years is the appropriate disposition in this case. The parties understand that, once the Court accepts the plea agreement, the Court is required to enter a sentence in this sentencing range. The parties further understand that, if the Court informs the parties that it intends to impose a sentence outside this sentencing range, either party has the right to withdraw from the plea agreement.

The government also agrees:

(1)    To dismiss all counts within the pending Indictment (other than Count 11 to which the Defendant is pleading guilty) at the time of sentencing;

(2)    Not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado;

2

(3)    To request a sentence of not more than 15 years imprisonment;

(4)    With the below projected calculations (part VI) under the U.S. Sentencing Guidelines; and

(5)    To request and/or not oppose efforts by the Defendant to have the sentencing hearing occur first within the instant federal case before proceeding to any sentencing hearing in the related state court case pending in *Colo. v. Carie Hallford*, Case No. 2023CR4856, El Paso Co. District Court, Colorado.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government further agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

### C.   Defendant's Waiver of Appeal:

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)    the sentence exceeds the maximum sentence provided in the statute of conviction, conspiracy to commit wire fraud in violation of Title 18, U.S.C., § 1349;

(2)    the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how her sentence exceeds the statutory maximum sentence.  But if the second criteria applies, the

defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings.  In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a)

4

grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### D.  Restitution

The parties stipulate that the minimum amount of total restitution owed by the Defendant is $1,012,300.  The list of specific victims owed restitution and the respective amount of restitution owed to each victim will ultimately be determined by the Court at sentencing.

With respect to restitution, the defendant agrees to fully: (1) cooperate in the investigation of the amount of loss and the identification of victims to whom that restitution is due; (2) comply with any restitution order entered at the time of sentencing; (3) cooperate in all efforts to collect restitution by any means deemed appropriate by the United States.

The defendant understands that neither personal economic circumstances or resources, nor the fact that the victims have, or are entitled to receive compensation for their injuries from the proceeds of insurance or any other source, are grounds the Court may use to deny restitution.  The defendant understands the amount of Court ordered restitution will not be a basis to withdraw the defendant's guilty plea.

The defendant understands that the imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.  The defendant agrees that any restitution imposed will be non-dischargeable in any bankruptcy proceeding and the defendant will not seek a discharge of the restitution obligation.

**E.    Forfeiture of assets**:

The defendant admits the forfeiture allegation. The defendant further agrees to forfeit any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds obtained directly and indirectly as a result of the violations for which defendant is pleading guilty, including, a money judgment in the amount of proceeds obtained by the defendant and the scheme. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere.

The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to her if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e). Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

## II.    ELEMENTS OF THE OFFENSE

The parties agree that the elements of Conspiracy to Commit Wire Fraud are as follows:

6

### Count 11:  18 U.S.C. § 1349
### Conspiracy to Commit Wire Fraud

*First*: The defendant agreed with at least one other person to violate the law to knowingly commit wire fraud,

*Second*: The defendant knew the essential objective of the conspiracy,

*Third*:  The defendant knowingly and voluntarily involved herself in the conspiracy,

*Fourth*: There was interdependence among the members of the conspiracy, that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged, and

*Fifth*: The defendant acted with the specific intent to defraud.

*Tenth Circuit Pattern Jury Instructions*, No. 2.19 (updated July 2023) (elements modified from 18 U.S.C. § 371 conspiracy instruction[1]); *United States v. Fishman*, 645 F.3d 1175, 1186 (10th Cir. 2011) (wire fraud conspiracy under § 1349 does not require proving an overt act).

### Wire Fraud – (substantive offense of conspiracy)

The parties agree that the elements of the substantive offense of wire fraud are

as follows:

*First*: the defendant devised or intended to devise a scheme to defraud, as alleged in the indictment;

*Second*: the defendant acted with specific intent to defraud;

*Third*: the defendant used interstate or foreign wire communications facilities or caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

*Fourth*: the scheme employed false or fraudulent pretenses, representations, or promises that were material;

*Tenth Circuit Pattern Jury Instructions*, No. 2.57 (updated July 2023).

---

[1] There is no Tenth Circuit pattern jury instruction for a 18 U.S.C. § 1349 conspiracy.

### III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 11 of the Indictment is: not more than 20 years of imprisonment, a maximum fine of $250,000, or both fine and imprisonment; not more than a three year term of supervised release; a $100 mandatory victim's fund assessment fee; restitution; and forfeiture.

### IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.  If the defendant is an alien, the conviction may cause the defendant to be deported and removed from the United States, or confined indefinitely if there is no country to which the defendant may be deported, denied future admission into the United States, and/or to be denied citizenship.

### V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct:

**Background**

The defendant CARIE L. HALLFORD and her co-defendant JON M. HALLFORD (collectively referred to as the "HALLFORDS") were married to each other and were residents of the State and District of Colorado. The HALLFORDS were joint owners of "HallfordHomes, LLC" which was a Colorado based business entity that operated under the tradenames "Return to Nature Funeral Home," "Return to Nature – Burial and Cremation," "Return to Nature Crematory," and "Return to Nature Funeral Services" (collectively referred to as "Return to Nature Funeral Home").

The HALLFORDS operated Return to Nature Funeral Home from approximately August of 2017, through October 5, 2023, at which point it was closed by State of Colorado law enforcement and regulatory officials.  The HALLFORDS ran their funeral home business from two locations, 944 Elkton Drive, Colorado Springs, Colorado, ("Elkton location"), and 31 Werner Road, Penrose, Colorado ("Penrose location"). JOHN HALLFORD and CARIE HALLFORD each maintained a 50% ownership interest in Return to Nature Funeral Home.

**The Scheme to Defraud Customers of Return to Nature Funeral Home**

Beginning on or about September 15, 2019, and continuing through October 5, 2023, in the State and District of Colorado, defendants CARIE HALLFORD and JON HALLFORD and worked together in a conspiracy to devise a scheme to defraud and to obtain money and property from the customers of Return to Nature Funeral Home by means of materially false and fraudulent pretenses, representations and promises.

As part of the scheme to defraud funeral home customers, the Defendant along

with her husband engaged in the following acts:

The HALLFORDS through their business, Return to Nature Funeral Home, offered various services and products to members of the public including, funeral burials and cremations. The HALLFORDS advertised their business to potential customers using an internet website which stated, among other things, in its "Frequently Asked Questions" section the following:

> Return to Nature Funeral Home is a unique Family Owned and Operated Colorado Springs & Penrose mortuary service. We operate with three generations of Funeral Service Experience and Education. Our Family is here to serve your Family and guide You through every step of the bereavement process. We cater to Your Family and provide Your Loved One with the utmost Professional Care and Discretion. Our Family Serving Your Family, for over 80 years.

JON HALLFORD and CARIE HALLFORD typically met with customers and offered to provide either a burial or a cremation for the deceased using the services of Return to Nature Funeral Home. The customers included individuals making their own funeral arrangements prior to death, family members or friends of the recently deceased, or the next-of-kin of the deceased. Such customer meetings were commonly held in person at the Elkton location in Colorado Springs.

JON HALLFORD and CARIE HALLFORD typically entered into a "Contract for Goods & Services" with customers related to the services to be provided in connection with a burial or cremation. The Return to Nature Funeral Home contracts typically set forth the specific arrangements which the HALLFORDS agreed to provide for the customer related to the disposition of the body of the deceased.

When a customer selected a cremation, the HALLFORDS agreed as part of the contract with a customer to arrange for the body of the deceased to be cremated.

Afterwards, the HALLFORDS agreed to return the cremains (also referred to as ashes) within an urn to a family member, friend, or a designated next-of-kin. The HALLFORDS did not conduct the cremations themselves, as their business did not possess a cremation retort (which is the incineration chamber or oven used for the actual cremation). Instead, the HALLFORDS utilized third-party businesses to conduct cremations on behalf of Return to Nature Funeral Home customers.

When a customer selected a funeral burial, the HALLFORDS agreed to provide a burial of the deceased at a designated cemetery as well as supply the specific type of coffin purchased by the customer. The HALLFORDS verbally promised and represented to customers that they would provide either the cremation or burial as set forth within the written terms of the Return to Nature Funeral Home contract.

The HALLFORDS charged a fee for their services the amount for which was set forth within the parties' contract. The costs of each contract varied based on the goods and services purchased by a customer but commonly ranged between $900 and $1,400 for cremations. Costs for burials were substantially higher than cremations in most cases. The HALLFORDS were paid by customers through various means including, cash, check, and credit card. Many of the customers paid Return to Nature Funeral Home with a credit card using the payment processing service "Square, Inc." (later known as "Block, Inc.") which operated within interstate commerce and was located outside of Colorado.

CARIE HALLFORD handled much of the banking, invoicing, contracting with customers, filing of required paperwork, bookkeeping and communications with customers. JON HALLFORD also regularly interacted with the customers; he was also

11

responsible for removing the bodies of the deceased, transporting the bodies of the deceased, and processing and preparing the bodies for burial or cremation. JON HALLFORD processed and prepared the bodies of the deceased at one of three locations to include: 815 E. Platte Ave. Colorado Springs, CO, the Elkton location and the Penrose location. Return to Nature Funeral Home employed various employees who assisted in its operations during various times throughout the scheme.

The HALLFORDS failed to provide the basic core service it promised to some of its customers – either a cremation or a burial. Nonetheless, the HALLFORDS continued to collect payment from such customers (also referred to as "victims") for funeral services and goods despite not fulfilling their commitment to provide a cremation or burial. At times, the HALLFORDS collected payment for cremation or burial costs from an insurance company, government entity or third-parties connected to the deceased.

Beginning as early as September of 2019, and continuing through October of 2023, the HALLFORDS failed to cremate or bury approximately 190 bodies in connection with the scheme. As a result, the HALLFORDS collected in excess of $130,000 from victims for cremation or burial services which they never provided.

The HALLFORDS attempted to conceal their fraudulent activity by allowing the 190 bodies to remain in various states of decay and decomposition within the Penrose location in Penrose, Colorado. The HALLFORDS concealed the gruesome collection of bodies at their Penrose location by preventing outsiders from entering their building, covering the windows and doors of the building to limit others from viewing inside, and providing false statements to others regarding the foul odor emanating from the building and the true nature of the activity occurring inside.

The HALLFORDS routinely prepared death certificates for the deceased and then filed, or caused to be filed, such certificates with the State of Colorado's Electronic Death Registry.  On many of the death certificates for the 190 bodies found at the Penrose location, CARIE HALLFORD, with the assistance of JON HALLFORD, falsely stated that the "method of disposition" was by either cremation or burial when in truth and in fact, the HALLFORDS knew that there was no disposition of certain bodies as they were left decomposing at the Penrose location.

The HALLFORDS at times misrepresented to, and concealed from, the third-party businesses conducting cremations on behalf of Return to Nature Funeral Home the true identities of some of the bodies being submitted for cremation.  As a result, the third-party businesses at times misidentified within their own records the identities of bodies which were cremated.

The HALLFORDS – in a number of instances – provided the decedent's family members, friends, or the designated next-of-kin with an urn filled with dry concrete mix instead of the actual cremains of the deceased.  The HALLFORDS on at least two occasions also arranged for and provided the wrong body for a cemetery burial resulting in the incorrect remains being buried in a gravesite plot while concealing this fact from the next-of-kin[2].

**Interstate Wire Communications Related to Funeral Home Customers**

In order to carry out and execute the above fraud scheme, the Defendant and her husband worked together to cause multiple interstate wire communications to occur. The following are ten such examples of wires caused by the HALLFORDS in

---

[2] JON HALLFORD maintains that on these occasions involving burials where incorrect remains were in fact buried, this was accidentally done and not the result of an intentional act.

furtherance of the scheme:

| Date | Description of Wire Communication |
|------|-----------------------------------|
| 10-21-19 | Credit card payment in the amount of $566.88 from Victim-1 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 4-27-20 | Credit card payment in the amount of $935.71 from Victim-2 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 5-18-20 | Credit card payment in the amount of $1,916.71 from Victim-3 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 11-19-20 | Credit card payment in the amount of $1,104.71 from Victim-4 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 11-24-20 | Credit card payment in the amount of $1,345.71 from Victim-5 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 11-1-22 | Credit card payment in the amount of $1,339.69 from Victim-6 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 11-17-22 | Credit card payment in the amount of $1,439.84 from Victim-7 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 2-19-23 | Credit card payment in the amount of $1,365.69 from Victim-8 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 6-2-23 | Credit card payment in the amount of $1,483.58 from Victim-9 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |
| 8-6-23 | Credit card payment in the amount of $1,365.69 from Victim-10 to Return to Nature Funeral Home in Colorado using Square Inc./Block Inc. which was located outside of Colorado |

**Discovery of Penrose Location and Human Remains**

On October 5, 2023, the FBI, state law enforcement officers, and regulatory officials searched and processed the Penrose location. Within the Return to Nature building, officials recovered multiple human remains in various states of decay. The

14

conditions within the Penrose location presented an extremely hazardous environment for all first responders and other members of the public who may have encountered the building. Workers entering the building were required to wear specialized hazmat gear and they were only allowed to remain within the facility for brief intervals due to the toxic environment. Law enforcement officers and any member of the public who encountered the location were at risk of contracting an illness and thus suffering serious bodily injury (i.e. the conditions in the building could have led to an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation" as defined in USSG 1B1.1, note 1(M)). After exiting the building, workers were required to follow a rigorous decontamination protocol to ensure the safety of their health. Later, the Environmental Protection Agency condemned the entire building at the Penrose location after determining it to be a toxic waste site unfit for further human usage and a serious health threat to others who might encounter it in the future. Ultimately, on April 20, 2024, the EPA razed the building to the ground. The EPA then disinfected the building materials and foundation, and later transferred the debris to an off-site hazardous waste dump. The Defendant agrees that her offense involved a conscious or reckless risk of death or serious bodily injury.

**Other Relevant Conduct**

As part of the parties' plea agreement, the Defendant admits the Government could prove the below criminal conduct involving an additional fraud scheme related to Return to Nature Funeral Home with respect to Covid-relief loan funds as charged in Counts 12-14 of the Indictment. *See* U.S.S.G. § 1B1.2(c) ("A plea agreement (written or

made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s)"). The parties agree that, by admitting these facts, the Court should sentence the defendant as if he had been convicted of these additional counts, and that these counts would group with Count 11 pursuant to § 3D1.2 (counts involving substantially the same harm within the meaning of this rule group (d) "[w]hen the offense level is determined largely on the basis of the total amount of … loss.").

Therefore, the parties agree that the loss amount connected with both fraud schemes constitutes the overall "loss amount" related to the count of conviction. Here, the parties have stipulated that the combined total amount of loss in this matter for the two fraud schemes should be $1,012,300 (resulting in a 14-level increase pursuant to USSG § 2B1.1(b)(1)(H) because the offense conduct involved a loss amount greater than $550,000 but less than $1,500,000).

### The Scheme to Defraud the United States Small Business Administration

The Defendant and co-defendant also engaged in a separate scheme to defraud the United States Small Business Administration ("SBA").

The SBA is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. On March 27, 2020, the President of the United States signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which provided emergency assistance to small business owners suffering adverse economic effects caused by the Coronavirus ("COVID-19") pandemic. One source of funding for small businesses was the Economic

Injury Disaster Loan ("EIDL") program.

The EIDL program was an SBA program that provided low-interest financing to small businesses in regions affected by declared disasters. The CARES Act authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic.

In order to obtain an EIDL, a qualifying business was required to submit an application to the SBA which contained truthful and accurate information about the applicant. EIDL funds were issued directly by the SBA and were permitted to be used for working capital for such things as: payroll expenses, sick leave, production costs, and business obligations, such as debts, rents, and mortgage payments. The loan funds were not to be used for personal, family or household items.

Beginning on March 30, 2020, and continuing through March 1, 2022, CARIE HALLFORD and JON HALLFORD worked together and with each other in a conspiracy, to devise a scheme to defraud and to obtain money and property from the SBA by means of materially false and fraudulent pretenses, representations and promises.

As part of the scheme to defraud the SBA, the Defendant along with her husband engaged in the following acts:

From on or about March 30, 2020, through on or about October 20, 2021, the HALLFORDS worked together to prepare and submit loan documentation to the SBA which contained materially false representations. As a result, the HALLFORDS received three separate funding payments from the SBA in connection with a loan totaling $882,300 based on their fraudulent misrepresentations to the SBA.

The HALLFORDS made material misrepresentations to the SBA regarding their

eligibility to qualify for such loan and grant funds on their initial EIDL loan application, original loan agreement, and amended loan agreements, to include:

   (a) falsely stating that the HALLFORDS were "not engaged in any illegal activity" when in truth and in fact, the HALLFORDS were jointly engaged in a separate, ongoing wire fraud scheme to defraud customers of their business, Return to Nature Funeral Home, in violation of 18 U.S.C. §§ 1343 and 2, and conspiracy to do the same in violation of 18 U.S.C. § 1349; and

   (b) falsely stating that neither of the HALLFORDS were "more than sixty (60) days delinquent on child support obligations" when in truth and in fact, the HALLFORDS each knew that JON HALLFORD was more than 60 days delinquent on his child support obligations as required by a district court within the State of Oklahoma.

The HALLFORDS caused the SBA to approve three requests for EIDL funds to Return to Nature Funeral Home. The SBA funded the HALLFORDS' business loan as follows:

| Date | Amount | Loan Description | Total Principal Loan Balance |
|------|--------|------------------|------------------------------|
| 5/19/20 | $ 150,000 | original loan | $ 150,000 |
| 5/24/21 | $ 350,000 | loan modification #1 | $ 500,000 |
| 11/9/21 | $ 382,300 | loan modification #2 | $ 882,300 |

The SBA loan funds, less the $100 UCC-1 fee for the first EIDL loan, were deposited in the HALLFORDS' ENT Credit Union bank account (account ending #5380) which they jointly controlled together on behalf of their business.

    The HALLFORDS falsely certified on their original loan agreement and amended loan agreements that the SBA loan proceeds would be used solely as working capital to alleviate economic injury caused by the COVID-19 pandemic. They also agreed that as part of each of the loan agreements that, among other things, they would not distribute, advance, loan, or gift any of the loan proceeds to the company's owners or employees or to any other company without SBA advance consent. The HALLFORDS also falsely

certified on the security agreements for each loan that none of the loan funds are or will be used primarily for personal, family, or household purposes. When accepting the loan funds, the HALLFORDS also acknowledged that misuse and misapplication of loan funds was not allowed for under the terms of each loan and could result in punishment under the law.

The HALLFORDS used the bulk of the loan proceeds for their personal benefit despite making the above certifications and acknowledgements. Specifically, following the HALLFORDS' receipt of $350,000 in loan funds on May 24, 2021 (loan modification #1), and $382,300 in loan funds on November 9, 2021 (loan modification #2), the HALLFORDS misused a substantial portion of the funds for personal purposes instead of using the funds for working capital to sustain their business. The HALLFORDS misapplied the SBA funds for their own use and personal benefit by spending the funds on such things as: a vehicle, multiple vacations, entertainment, dining, tuition for a minor child, cryptocurrency, cosmetic medical procedures, jewelry, various goods and merchandise from Amazon, and payments to other vendors unrelated to their business.

### Interstate Wire Communications Related to SBA

In order to carry out and execute the above fraud scheme, the Defendant and her husband worked together to cause multiple interstate wire communications to occur. The following are three such examples of wires caused by the HALLFORDS in furtherance of the scheme:

| Date | Description of Wire Communication |
|---|---|
| 5-19-20 | Payment file for Economic Injury Disaster Loan of $149,900 from SBA finance center in Colorado to U.S. Treasury disbursing office outside of Colorado caused by the |

| | |
|---|---|
| | HALLFORDS' submission of an EIDL application and connected loan documents. |
| 5-24-21 | Payment file for Economic Injury Disaster Loan of $350,000 from SBA finance center in Colorado to U.S. Treasury disbursing office outside of Colorado caused by the HALLFORDS' request for an EIDL modification to increase the loan amount. |
| 11-9-21 | Payment file for Economic Injury Disaster Loan of $382,300 from SBA finance center in Colorado to U.S. Treasury disbursing office outside of Colorado caused by the HALLFORDS' request for an EIDL modification to increase the loan amount. |

**Total Restitution**

The parties stipulate that the minimum amount of total restitution owed by the Defendant is $1,012,300. The amount of restitution owed for the SBA loan fraud scheme is $882,300. The amount of restitution owed to victims of the Return to Nature Funeral Home fraud is tentatively calculated to be at least $130,000. The figure is tentative because between the present time and sentencing, the FBI may identify additional human remains collected at the Penrose location. The parties agree that should additional remains be identified, the Defendant would be responsible for any additional restitution or loss amount connected with such discovery. The final amount of restitution will ultimately be determined by the Court at sentencing.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth

below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government also has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

A.    The base guideline is § 2X1.1 which instructs that the base offense level is the guideline for the underlying substantive offense, plus any adjustments from such guideline for any intended offense conduct.

Here, the substantive offense is wire fraud and the parties agree that the Defendant and co-defendant intended and completed all of the acts necessary on their part for the successful completion of the offense of wire fraud. Therefore, the controlling guideline calculation for the offense conduct is § 2B1.1. The base offense level for wire fraud is 7. § 2B1.1 (a)(1).

B.    The parties agree that the following specific offense characteristics apply under § 2B1.1(b):

> (1)    There is a 14-level increase pursuant to § 2B1.1(b)(1)(H) because the offense conduct involved a loss amount greater than $550,000 but less than $1,500,000. (The loss amount connected to Count 11 which relates to defrauding the funeral home victims was at least

$130,000, and the loss amount from relevant conduct related to the receipt of Covid-relief loan funds was $882,300. Therefore, the combined total loss amount was $1,012,300).

(2)   There is a 2-level increase pursuant to § 2B1.1(b)(2)A)(i) because the offense involved 10 or more victims.

(3)   There is a 2-level increase pursuant to § 2B1.1(b)(10)(C) because the offense involved sophisticated means.

(4)   There is a 2-level increase pursuant to § 2B1.1(b)(16)(A) because the offense involved a conscious or reckless risk of death or serious bodily injury.

C.   There are no obstruction of justice or multiple count adjustments that apply.

D.   There is a 2-level increase for a victim-related adjustment pursuant to § 3A1.1(b)(1) because the Defendant knew or should have known that a victim of the offense was a vulnerable victim.

E.   There is a 2-level increase for a role-in-the-offense adjustment pursuant to § 3B1.3 because the Defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense.

F.   The adjusted offense level is therefore 31.

G.   Acceptance of Responsibility:  The parties agree that the defendant should receive a 3-level adjustment for acceptance of responsibility.  The resulting total offense level therefore would be **28**.

H.    Criminal History Category: The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be category I. The Defendant is not entitled to zero-point offender adjustment because the Defendant knew or should have known that a victim of the offense was a vulnerable victim pursuant to U.S.S.G. § 4C1.1(a)(9).

I.    Career Offender Not Applicable: The career offender/criminal livelihood/armed career criminal adjustments do not apply.

J.    Imprisonment: The advisory guideline range resulting from these calculations is **78-97 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 78 months (bottom of Category I) to 175 months (top of Category VI). The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction. Here, the count of conviction has a statutory maximum of not more than 20 years (240 months).

K.    Fine: Pursuant to guideline § 5E1.2, the fine range for this offense would be $25,000 to $250,000, plus applicable interest and penalties.

L.    Supervised Release: Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is not more than 3 years.

M.    Restitution: The Defendant agrees to pay restitution to the victims of the offense as set forth within this plea agreement and ultimately determined by the Court at sentencing.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 10/24/24

Carie L. Hallford
Defendant

Date: 10/24/24

Robert Charles Melihercik
Attorney for Defendant

Date: 10/24/24

Tim Neff
Assistant U.S. Attorney

Date: 10/24/24

Craig G. Fansler
Assistant U.S. Attorney

24