IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 24-cr-00113-NYW

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**1.**     **JON M. HALLFORD**,

        Defendant.

---

## DEFENDANT'S SENTENCING STATEMENT

---

Jon M. Hallford, through his attorney, Assistant Federal Public Defender Laura H. Suelau, respectfully requests this Court impose a sentence of 120 months imprisonment. One hundred twenty (120) months is three years above the top of the applicable guideline range (78 to 97 months), however it is the sufficient, but not greater than necessary, sentence in this case. The government's sentencing statement asserts that "the extraordinary harm suffered by the victims and community in this case warrant a significantly higher sentence than recommended by the guidelines." Mr. Hallford does not disagree. However, the 180-month sentence advocated by the government is greater than necessary for several reasons.

First, there is a separate and concurrent state prosecution that accounts for some of that harm, specifically the harm caused by Mr. Hallford's abuse of 191 corpses. Second, the sentence recommended by the guidelines is already higher than the average sentence for defendants sentenced pursuant to §2B1.1 for wire fraud. Third, assuming the efficacy of the guideline range, the applicable range already captures much of the aggravation in this case. Fourth, 120 months *is* significantly higher than that already-aggravated range but, importantly, is in line with other cases where the applicable range produced by § 2B1.1 may not fully capture the harm caused by the charged offense. A sentence

greater than 120 months would create an unwarranted sentencing disparity and is, for all purposes, a greater than necessary sentence.

I.   **A sentence of ten years appropriately reflects the nature and circumstances of the instant fraud offense and Mr. Hallford's history and characteristics.**

a.   **Mr. Hallford was charged with and is being sentenced for violations of 18 U.S.C. § 1349.**

Mr. Hallford's conduct here involved two frauds – fraud against the United States government when he provided false information for COVID-relief funds ("the scheme to defraud the United States Small Business Administration" or "SBA fraud"), and fraud against customers of Return to Nature Funeral Home ("customer fraud"). The loss amount attributable to the SBA fraud is approximately $882,300. The loss amount attributable to customer fraud is approximately $130,000, a comparably lower loss amount. The crux of the government's argument in support of a 180-month sentence is that Mr. Hallford's customer fraud "gravely overstepped societal norms," failed to treat customer bodies with "dignity," and generally caused harms "that [are] difficult or impossible to quantify in monetary terms." Mr. Hallford does not disagree that his conduct was abhorrent, indecent, and caused grave harm to many. However, this Court need not attempt to quantify that harm in monetary, or any terms. Mr. Hallford is appropriately being sentenced for the non-fraud harm caused by his actions in a separate and concurrent prosecution.

b.   **There is a separate and concurrent prosecution for the purpose of determining the appropriate sentence for Mr. Hallford's abuses of corpses at Penrose.**

The government's analysis fails to not acknowledge that Mr. Hallford is separately charged in El Paso County Case 2023CR4849 with 191 counts of felony abuse of a corpse in violation of C.R.S. 18-13-101(1)(b) – a crime that *does* quantify the harm caused by Mr. Hallford's actions at Penrose and the "despair, disbelief, betrayal, anger, vengeance, sadness, frustration, and grief" felt by victims. Doc.

88.[1] Indeed C.R.S. § 18-13-101(1)(b), making it a crime to "[treat] the body or remains of any person in a way that would outrage normal family sensibilities," was revised in 2020 from a misdemeanor to a felony offense for the precise purpose of punishing the non-economic harm caused by such offenses. Colorado State Representative Matt Soper of Delta County sponsored the bill that effectuated that change and explained that "conversations with families who felt betrayed by Sunset Mesa [Funeral Home in Montrose, Colorado] demonstrated the need for this bill."[2] Rep. Soper continued, "They understood the kind of white collar crime that existed — the deceptive business practice — but they wanted something more than that." *Id.*

In his El Paso County case, as here, Mr. Hallford has fully accepted responsibility and pleaded guilty on November 22, 2024, to all 191 counts of § 18-13-101(b). While Mr. Hallford's admittedly disgraceful treatment of those bodies entrusted to him is properly considered relevant conduct pursuant to §1B1.3,[3] questions as to how that treatment should be sentenced will be adjudicated by Judge Eric Bentley in El Paso County. Therefore, this Court need not sentence Mr. Hallford for harms the government admits are "difficult or impossible to quantify." Instead, this Court should focus on the federal crime at issue here, fraud.[4]

### c. After early personal and professional setbacks, Michael Hallford found a passion in mortuary science, and love in Carie Hallford.

In order to understand how Mr. Hallford ended up committing multiple crimes after 40 law-abiding years, it is necessary to understand the history that led him to opening a family-owned funeral home business, how that business led to the illegal storage of bodies entrusted to his care, and the

---

[1] Mr. Hallford was charged in El Paso County with 286 total counts for Money Laundering, Forgery, Theft, and Abuse of Corpse.
[2] Denver Post, *Abusing a corpse could soon be a felony in Colorado,* Dec 19, 2019, https://www.denverpost.com/2020/01/21/sunset-mesa-megan-hess-bill/.
[3] For that reason, Mr. Hallford's sentence in the instant case "shall" be imposed to run concurrently with his anticipated term of imprisonment in El Paso County Case 2023CR4849. §5G1.3(c).
[4] As explained *infra,* Mr. Hallford's pending sentencing for the Abuse of Corpse charges sets his case apart from the defendants in *United States v. Hess,* et. al, 20-cr-00098-CMA who were not charged with felony offenses by the state of Colorado.

resulting fraud offenses – defrauding families to maintain his business, and defrauding to the government to stay afloat financially.

Jon "Michael" Hallford grew up the youngest of three children in a loving and supportive family in Wagoner, Oklahoma.[5] Wagoner is a small community with close ties to the Baptist Church. As a young adult, Mr. Hallford faced personal and aspirational setbacks that led him to feel like an outsider in Wagoner. That began after high school, when Mr. Hallford engaged in biblical studies at Oklahoma Baptist University to become a minister and live a life of service. His father, Jonny Hallford, was a deacon at the local Baptist Church and Mr. Hallford was deeply religious. Mr. Hallford's mentor was a local pastor and family friend. Friends and family describe that Mr. Hallford "idolized" the man and aspired to be like him. Then, Mr. Hallford learned the man was having extramarital affairs and defrauding his parishioners. Mr. Hallford was devastated and questioned his choice to become a minister. Perhaps in reaction to that loss, Mr. Hallford decided to join the military. He enlisted in the Army, but after a few months of service was diagnosed with atrial fibrillation – a condition that led to his medical discharge.

Soon after his dreams of serving his country were dashed, a woman Mr. Hallford was dating became pregnant. Mr. Hallford's parents told him plainly – you have no choice but to marry. However, the damage to his reputation was done and he faced judgment and rejection in his church community. Mr. Hallford's first son, Noah, brought him great joy, but his relationship with the mother was short-lived. The couple, who'd dated only a short time before marrying, were incompatible and soon divorced. With the divorce came further separation between Mr. Hallford and his faith; he eventually stopped attending church and engaging with organized religion altogether.

---

[5] Information included herein is based on counsel and Federal Public Defender Investigator Amanda Carroll's interviews with Mr. Hallford; his parents, Judy and Jon (Jonny) Hallford; his sister, Bekki Watkins; his son, H.H.; and his childhood friend, Jason Butler.

Despite those significant setbacks, Mr. Hallford displayed resilience and in 2003 enrolled in Dallas Institute of Funeral Service in Dallas, Texas. After false starts in the ministry and the military, Mr. Hallford found he was a natural at mortuary science. His sister describes that he was good with people and excelled at reconstruction and other burial-related tasks. At the time Mr. Hallford attended mortuary school (and even now) the curriculum focused on embalming, restorative arts, and burial-related services – all things at which Mr. Hallford excelled. However, over the past two decades, there has been a dramatic shift in the industry from burials to cremations. Cremations are twice as popular now as they were two decades ago.[6] The traditional burials and funerals in which Mr. Hallford was trained, and for which he has a passion, are becoming extinct.

After graduating with his mortuary degree, Mr. Hallford began working for Petering Funeral Home in Muskogee, Oklahoma. He remarried and had a second child, but that marriage too, was short lived after Mr. Hallford learned his wife, a physical therapist, engaged in an affair with her patient. Still young in his career, Mr. Hallford struggled to support himself and two young children on his modest salary. Mr. Hallford's relationships with his ex-wives were often strained and he did not see his sons as often as he wanted.

Then, in 2013, Mr. Hallford met Carie Hallford. Ms. Hallford too had faced personal setbacks and was a single mother to two young children. The couple fell madly in love and Mr. Hallford stepped up as father to the children. In 2015, after Mr. Hallford's father stepped away from their family-owned funeral business in Oklahoma, Michael and Carie decided to relocate and seek a fresh start in Colorado Springs.

---

[6] *See* The Washinton Post, *The stunning rise of cremation*, https://www.washingtonpost.com/lifestyle/2022/04/18/cremation-death-funeral/ (Apr. 19, 2022); *See also,* National Funeral Directors Association, https://nfda.org/news/statistics (last accessed Mar. 6, 2025). This was corroborated by funeral home directors with whom counsel consulted, one who commented "mortuary college doesn't prepare you for a cremation-based business."

### d. Mr. Hallford began Return to Nature with pure intentions and provided many families with legitimate and honorable goods and services.[7]

After years of personal and professional setbacks, moving to Colorado Springs with Carie and her two children presented Mr. Hallford with an opportunity to start over. Later, Mr. Hallford's second son joined the couple. The increased cost of living in Colorado as a family of five seemed a manageable barrier, but financial stress was often at the forefront for the couple. They hoped, however, that starting their own business would provide financial, professional, and personal fulfillment. Unfortunately, the Hallfords' dreams of starting a business together and raising their children outside small-town Oklahoma devolved into a nightmare.

In 2017, Mr. Hallford began Return to Nature (RTN) with great promise. The crux of the business was to offer "natural burials." In interviews with the Colorado Springs Gazette and Colorado Springs Business Journal shortly after opening, Mr. Hallford explained his distaste for the unpleasant and toxic chemicals used in embalming and the desire to offer families a more natural experience.[8] He also described a "passion" for his work and believed that with RTN, he'd found a "better way" to do that work. Instead of using formaldehyde and other harmful chemicals with heavy caskets, RTN proposed to offer green burials without embalming and using shrouds of containers made from natural materials such as cardboard or pine. Such environmentally friendly processes would also allow RTN to provide funeral services at a substantially lower cost than the tradition funeral with embalming and a casket. In that same article, an early RTN customer described the "healing experience" working with them provided her and her family. *Id.*

Return to Nature was not wholly unsuccessful in their mission and provided legitimate services and healing experiences for hundreds of families in the Colorado Springs area. Former employee Lauren Carroll, who worked for RTN between 2019 and 2021, was asked by law enforcement in 2023,

---

[7] The following information is based on the Presentence Report, Doc. 64, the "Adult Pre-sentence Investigation Report" in 23CR4849, and discovery provided by the government.

[8] Exhibit A, Articles from Colorado Springs Gazette and Colorado Springs Business Journal.

"did you think that Jon was someone who abided by that belief that people are to be treated with respect?" She responded affirmatively, "[a]t the time, yes. He respected bodies and took care of families." In a prescient follow-up, she observed, "I do think he was a really bad businessperson." Another employee, Steve Land, described how Mr. Hallford bought him a suit when he was hired, "he wanted me to look nice and I appreciated that." As far as Mr. Land observed, Mr. Hallford adhered to industry standards and news of the crime caught him by surprise, "that's insane." Former employee Chris Herring was unequivocal – "what [law enforcement is] seeing now isn't the guy I knew." Mr. Herring believed Mr. Hallford started RTN with good intentions, "I was definitely under the impression that he did this . . . because he thought it was the right thing to do." To him, Mr. Hallford was an experienced mortician, "when I met this guy, I was highly impressed, he believed in what he was doing."

Many customers similarly had favorable impressions of RTN, describing "smooth" and "compassionate" communication. One online review from 2019 states "compassion and heart shine through this wonderful family owned business…Jon and his team worked so tirelessly" and "the natural concept is beautiful and pricing that does not further burden the families is a blessing." Indeed, in 2020, the Gazette named Returned to Nature as their Expert Pic for "Best Final Farewell."[9]

### e. Mr. Hallford's fraud began with a simple business dispute but quickly became an insurmountable problem.

During his interview with the Gazette, Mr. Hallford (unknowingly) hinted at his downfall, describing opening the business as "wonderful," "…if you want to get shot out of a cannon." Mr. Hallford described, "we want to be the exact opposite of cookie cutter." However, Mr. Hallford failed to realize that offering customized experiences, at a relatively low price, in an industry that was increasingly moving away from burial and towards cremations, was unsustainable. Because of their favorable reviews, relatively low prices, and compassionate services, RTN became exceedingly popular

---

[9] Exhibit B, Award from Colorado Springs Gazette.

almost overnight. However, they faced one large barrier to scalable success – their reliance on third parties to perform cremations. RTN did not own a crematory, a machine that costs over $250,000, not including installation fees, licensing, and permitting. And as business grew, employees described that Mr. Hallford's troubles arose because "he wouldn't tell anybody 'no'," when, in fact, he did not have the ability to provide the needed services.

Between 2017 and 2019, RTN contracted with a crematory that could handle the volume of RTN's business. But in 2019, an employee at that crematory took issue with a RTN employee. Mr. Hallford was forced to choose between the employee and the crematory. He chose the employee and RTN was forced to find another crematory. For a brief time, they were without a crematory. On May 17, 2019, RTN signed a cremation contract with Roselawn Cemetery Association (RCA). The agreement between RTN and Roselawn made clear that Roselawn's own cremations would take precedence over any bodies brought from RTN. The contract specified that Roselawn's services were "pending availability of RCA retort" and "if RCA has 3 bodies that are ready to be cremated and RTNFH brings us a body, then RCA would reserve the right to refrigerate the deceased until retort space or personnel become available; OR require that RTNFH hold the body at their facility until Roselawn can accommodate RTNFH." INV_3920. In other words, if Roselawn could not "accommodate" a RTN cremation, they may not take the body at all. Desperate for a provider to keep his business afloat, Mr. Hallford overlooked obvious issues with the contract.

The first bodies were taken to Penrose, a building the Hallford's purchased in 2019 for the purpose of expanding their burgeoning business. Mr. Hallford intended the bodies to remain there only temporarily, until their cremation could be "accommodated." But the situation quickly snowballed and by the time of the COVID-19 pandemic, when deaths in the Colorado Springs area

spiked, the storing of bodies at Penrose became a problem without a solution.[10] In his presentence interview in anticipation for his sentencing in El Paso County, Mr. Hallford explained that the business "turned south and went terrible" after RTN entered the contract with Roselawn and lamented, "I just wanted to try and do a good service for families, and it went very bad."

Over the next four years, the situation at Penrose went from bad to worse. There is no excuse or justification for Mr. Hallford's actions during that time. Nor would any excuse be satisfactory. Statements from employees, Hallford family members, and the Hallfords' communications with each other suggest that Mr. Hallford tried, and failed, to remedy the situation at Penrose. Eventually, he came to understand it was a ticking time-bomb and became fixated on making it a single milestone: for the family's children graduating from high school. By that time, Mrs. Hallford's two children and Mr. Hallford's second son were residing with the couple in Colorado Springs. Mr. Hallford believed that either coming clean, or shutting the business down, would devastate the children. Mr. Hallford's son (who was unaware of his father's crimes until his arrest in 2023) explained to law enforcement – "he is genuinely a good person" who "did not want to hurt anyone." Instead "[he was] trying to protect his family and it got out of hand." Mr. Hallford acknowledges that wanting to protect one's family and things getting "out of hand" is neither a complete explanation nor a sufficient excuse for the harm caused by his actions, but it is true.

It is also true that Mr. Hallford did not begin Return to Nature with the intention of harming families or committing fraud. Instead, providing affordable and natural burials was a calling, one that filled a hole left behind by his departure from the ministry and his inability to serve in the military. And then, two years into business, Mr. Hallford made a misstep, and then another, and then another,

---

[10] Mr. Hallford explained in his El Paso County presentence interview that cooling units at Penrose were "running properly" until 2023. The refrigeration, despite the number of bodies, lulled Mr. Hallford into a false (and perhaps delusional) sense that the situation could be remedied.

and soon the problem became beyond repair and lies begot lies and the instant fraud. In end, Mr. Hallford's calling became his, and many people's, nightmare.

An investigative podcast hosted by Shawn Raviv called "Noble" investigated the Tri-State crematory in Noble, Georgia where over 300 uncremated bodies were found. Mr. Raviv reflected on the tragedy of Tri-States and the completely unsatisfactory "why" of that crime:

> [E]veryone has had jobs where you fall so far behind that you just can't catch up. And if burning bodies is your job and you get backed up, well, maybe to you, it's just a full [email] inbox. It's not the same as falling behind in your TPS reports, but it might feel that way to you. But just because you can twist and contort yourself into believing a scenario where what happened is somewhat understandable, that doesn't mean it's right.[11]

Now, nearly two years after Mr. Hallford's crimes were discovered, he is not seeking understanding. He knows what he did was not right. He simply asks this Court to consider that the nature and circumstances of this offense were, in many ways, the product of his job. A job he engaged in earnestly but managed poorly.

## II.    Mr. Hallford's applicable guideline range is both empirically flawed and already more aggravated than the typical sentence for wire fraud.

### a.    Courts recognize that §2B1.1 is empirically flawed and a poor measure of "harm."

Mr. Hallford's applicable guideline range is 78 to 97 months. Already, that range is based on empirically flawed data and over-inflates the culpability for fraud and other white-collar crimes. Before the promulgation of the sentencing guidelines in 1987, first-time offenders convicted of sophisticated fraud involving the highest loss amounts who were sentenced to prison served, on average, a sentence of 18-24 months, and 18% of such defendants received probation.[12] When explaining why the guidelines now encouraged some form of confinement, the Commission explained that "the definite

---

[11] Wavland, *Noble,* found at https://podcasts.apple.com/us/podcast/noble/id1757686789.
[12] See U.S. Sent'g Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 30 (1987), http://www.src-project.org/wpcontent/pdfs/reports/USSC_Supplementary%20Report.pdf

prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm."[13] However, that deterrence rationale was not based on empirical evidence. The empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment.[14] Nonetheless, since 1987, the Commission steadily increased the prison sentences recommended (at times mandated) for fraud offenses. Changes included increasing sentences for loss amounts, even as courts have recognized that the amount of "loss" is an imperfect measure of the seriousness of an offense.

Because courts broadly recognize that §2B1.1 is not based on empirical evidence, longer sentences do not result in greater deterrence, and that loss amount does not accurately capture harm, many courts vary from the recommended range. When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). As a result, the guidelines are a poor measure for determining the so-called "heartland" of a crime. Instead, this Court should consider the sentences actually imposed for defendants sentenced pursuant to §2B1.1 and for wire fraud generally.

b. **A sentence of 180 months is** *three times* **greater than the average sentence imposed for defendants sentenced pursuant to §2B1.1 and far greater than the average fraud sentence.**

As a preliminary matter, Mr. Hallford's applicable offense level, 28, already captures much of the aggravation in this case, including the "harm caused to victims and the community." First, he

---

[13] USSG, ch. 1, intro., pt. 4(d) (1987).

[14] See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."

receives a 14-level increase for loss over $550,000. Second, he receives a 2-level increase because the offense involved 10 or more victims. Third, he receives 2-level increase for "sophisticated means."[15] Fourth, he receives a 2-level increase for conscious or reckless "risk of death or serious bodily injury." Fifth, he receives a 2-level increase for this offense involving a vulnerable victim. Finally, he receives a 2-level increase for abusing a position of trust. At least eight points for the aforementioned enhancements specifically relate to the unique and aggravated nature of Mr. Hallford's treatment of the corpses in this case. Without those, his guideline range would be 33 to 41 months. Additionally, the enhancement for "vulnerable victim" precludes Mr. Hallford from receiving the "zero-point offender" decrease to which he'd otherwise be entitled under §4C1.1. With that decrease, his applicable guideline range would be 27 to 33 months. Therefore, it is not accurate to conclude that a guideline range of 78 to 97 months fails to account for the harm caused in this case. Nonetheless, even defendants in that aggravated §2B1.1 range are sentenced, on average, 17 months less.

According to Judiciary Sentencing Information (JSIN), for 163 defendants whose primary guideline was §2B1.1 with an offense level 28 and a criminal history category I (excluding those who received a reduction pursuant to §5K1.1), 161 received a sentence of imprisonment and the average length of imprisonment was 61 months.[16] Forty-five percent (45%) of those defendants received a downward departure or variance, and just 3% received an upward departure or variance.

The average sentences for fraud generally and government benefits fraud (like SBA fraud) also demonstrate that Mr. Hallford's applicable guideline range is *already* higher than the sentence most individuals convicted and sentenced for similar crimes receive. In 2023, 4,904 cases involved "theft, property destruction and fraud," and the average sentence was 23 months, with over 40% of those

---

[15] Despite the name, the Guidelines instruct this enhancement in situations that are decidedly not "sophisticated," including locating two offices in different jurisdictions. *See* §2B1.1(b)(10)(C), n.9(B). Such is the case here.

[16] USSG, JSIN, https://jsin.ussc.gov/analytics; Exhibit C, JSIN data for §2B1.1 defendants with offense level 28, criminal history category I.

12

defendants receiving a downward departure or variance.[17] Similarly, the average sentence for individuals convicted of government benefits fraud in 2023 was 19 months.[18]

When fashioning a sentence for Mr. Hallford, it is critical to consider that his applicable guideline range *already* captures the aggravated nature of this crime, is higher than the average actual sentence imposed for *all* §2B1.1 offenses in that range (61 months), and is many times higher than the average actual sentence imposed for fraud (23 months) and government benefits fraud (19 months) offenses.

### III. A sentence of greater than 120 months would create an unwarranted sentencing disparity with even the most aggravated fraud defendants.

This Court must, under federal statute, consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. 3553(a)(6). That is, sentences for defendants found guilty of similar crimes, and defendants found guilty of similar conduct. As outlined *supra,* Sentencing Commission data demonstrates that the 180-month sentence requested by the government, and advocated for by the probation officer, would create an unwarranted sentencing disparity between Mr. Hallford and other similarly-situated defendants.

The government's requested sentence is also greater than those sentences received by defendants charged with fraud that is "outside the heartland" of typical fraud cases, and with defendants in the funeral business who defrauded their customers, abused their positions of trust, failed to render the services they promised, and generally committed crimes that offend notions of humane and moral treatment of the dead.

---

[17] QuickFacts, Theft, Property Destruction, and Fraud, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY23.pdf.
[18] QuickFacts, Government Benefits Fraud, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Government_Benefits_Fraud_FY23.pdf.

1. **A sentence of 180 months is greater than other cases that might be considered outside the "heartland" of ordinary fraud.**

The sentence the government seeks is plainly greater than necessary, particularly in comparison to other fraud defendants with no criminal history but offenses that involved grave breaches of trust. The government seeks a sentence 45 months longer than that imposed for Elizabeth Holmes, who built a company based on lies about the product, technology, and outlook to investors to the tune of $700 million and $800 million in loss over the course of a 12-year fraud. Ms. Holmes spent that money for her own lavish lifestyle, including a $15 million home and a private jet. More than that, Ms. Holmes's conduct caused harm to patients who made important medical decisions based on misplaced reliance on her blood-testing technology. In some instances, her fraud caused patients to receive erroneous information about the status of their pregnancies. By many measures (length, scope, sophistication, loss, number of people harmed), Ms. Holmes's conduct was more aggravated that Mr. Hallford's. And, unlike Mr. Hallford, Ms. Holmes did not accept responsibility. Instead, she went to trial, forcing many of her victims to take the stand as witnesses. Ms. Holmes received a sentence of 135 months.[19]

Another fraud case involving a gross abuse of public trust involved former U.S. Senator for New Jersey, Robert Menendez. For four years, then-Senator Menendez accepted hundreds of thousands of dollars' worth of bribes in the form of gold, cash, cars, mortgage payments, home furnishings and other things of value. In exchange, Menendez, elected to a position of trust, power and influence by the people of New Jersey, protected the interests of private companies and foreign countries, such as Egypt. After being served subpoenas, Menendez obstructed justice and attempted to cover-up his scheme. Like Ms. Holmes, Sen. Menendez denied any wrongdoing and proceeded to

---

[19] *See United States v. Holmes,* 5:18cr0258 (N.D. California), Doc. 1649 (Gov't Sent. Stmt).

trial. He was ultimately found guilty on all counts.[20] Former Sen. Menendez was sentenced to 132 months in prison.

Finally, in *United States v. Shah,* 4:19cr00833 (S.D. NY), defendant Jennifer Shah pleaded guilty to one count of wire fraud after spending nearly ten years targeting vulnerable, elderly victims. In their request for a sentence of 120 months, the government noted that Ms. Shah continued her fraud even after portions of her business were shut down by the Federal Trade Commission, directed employees to lie to the law enforcement, and lied to law enforcement upon her own arrest. Not only did Ms. Shah use her ill-gotten profits to live a life of substantial luxury, including designer clothes, shoes, and accessories housed in a $7.4 million rental home, she also filed false tax returns to avoid paying taxes on those profits. Finally, post-arrest, Ms. Shah was far from contrite about her treatment of elderly victims, and instead she publicly (on a reality television show and in social media) proclaimed her innocence for over a year after her arrest.[21] Again, much of Ms. Shah's conduct during and after her offense was more aggravated than Mr. Hallford's. Ms. Shah was sentenced to 78 months in prison.

2. **Considering other cases involving abuses of corpses by those entrusted with their proper care, a sentence of 120 months is appropriate.**

The government highlights *United States v. Hess, et al.,* 20-cr-00098-CMA, and states that Mr. Hallford should be sentenced similarly to those individuals based on "parallels." The defendants in that case were sentenced to 240 and 180 months, respectively. However, even assuming the sentences imposed in those cases were reasonable (both are currently undertaking appeals), there are critical distinctions between those defendants and Mr. Hallford which make the conduct in those cases far more aggravated than Mr. Hallford's fraud.

First, as discussed *supra,* neither Ms. Hess nor her mother, Shirley Koch, were charged with felony abuse of a corpse. Therefore, their sentences in the fraud case were the whole of their

---

[20] Exhibit E, DOJ Menendez Press Release.
[21] *See United States v. Shah,* 4:19cr00833 (S.D. NY), Doc. 646 and Exhibit F, Shah Press Release.

punishment. Second, the conduct in that case spanned a period of eight years, rather than the four years at issue here. Third, the conduct in that case involved over 800 corpses. Fourth, unlike Mr. Hallford who was credentialed and began his business with earnest intentions, Ms. Hess lied about her qualifications to operate a funeral home and provide mortuary services.

Finally, the government's summary of the conduct in that case, Doc. 88, p. 13, mentions a critical aggravating factor absent here. That is, *after* "Hess and Koch worked together to defraud hundreds of customers by falsely representing that they would provide a cremation or burial services for the victims' next of kin," they engaged with body brokers and sold body parts, profiting a second time from the fraud. That aspect of the Hess/Koch crime is glossed over in the government's sentencing statement here but was not in their prosecution of those defendants – "such conduct was outrageous…she and her mother knew that they were selling the body parts of victims' loved ones out of the backdoor of her funeral home." The defendants there at times obtained "permission" for loved ones' bodies to be donated for medical research purposes and then sold the bodies to body brokers. Other times, they simply sold the body parts of corpses without obtaining any permission at all.[22] To perpetuate that separate fraud to "harvest human remains—such as heads, torsos, arms, legs, and entire human bodies—and market them for sale," Ms. Hess established a ruse Donor Services Foundation. *See United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024). During that crime, Ms. Hess exposed innumerable people to infectious diseases (including Hepatitis C and HIV) in the process of shipping body parts. None of Mr. Hallford's conduct during his fraud was remotely similar and he should receive a comparatively less aggravated sentence.

In *United States v. Rathburn,* 16-cr-20043 (E.D. Mich.), Arthur Rathburn was convicted after jury trial of seven counts of wire fraud and one count of transportation of hazardous materials. From 1997 to 2013 Mr. Rathburn, who at times ran a legitimate human remains business, defrauded

---

[22] *See United States v. Hess, et al.*, 20-cr-00098-CMA, Docs. 388,

customers (medical schools, etc.) by supplying them with remains from individuals infected with infectious diseased such as HIV. In the process, Mr. Rathburn endangered not only his customers, but unknowing baggage handlers and airport employees who handled his "shoddy and leaky" packages of human remains.[23] The loss attributed to Mr. Rathburn's crimes was approximately $2,757,831. For that conduct, which is at times more- and at times less-aggravated that Mr. Hallford's, Mr. Rathburn was sentenced to 108 months imprisonment.

Finally, in what is perhaps the most similar (but still more aggravated) comparative case, crematory operator Ray Marsh left 334 bodies to decay on the property of Tri-State Crematory in Georgia.[24] Mr. Marsh owned and operated the crematory, inherited from his father, from 1996 until 2002 when federal agents found uncremated bodies scattered inside and outside the Marsh property. It took a federal disaster team months to find and identify the remains. Ultimately, only 226 of the 334 remains found were identified. As here, Mr. Marsh gave some families concrete dust. The state of Georgia charged Marsh with 787 counts, including theft by deception, abusing a corpse, burial service-related fraud and giving false statements. Mr. Marsh pleaded guilty.[25] There were no federal charges filed against Mr. Marsh. For *both* the abuse of a corpse-related counts, and the fraud, Mr. Marsh was sentenced to 12 years imprisonment. Sentencing Mr. Hallford to 15 years here, in addition to the anticipated 20-year sentence in the state of Colorado, would create an unwarranted disparity.

### IV.    There is no need for additional deterrence here.

A sentence of ten years appropriately deters Mr. Hallford, and others, from engaging in similar conduct. The government insinuates that Mr. Hallford, who will be in his mid-50s by the time of his release, still "maintains the ability to gain employment in the future." Certainly, that is true. However, it does not follow that his ability to be employed makes it more likely that he will engage in fraud in

---

[23] *See United States v. Rathburn,* 16-cr-20043 (E.D. Mich.), Doc. 149.
[24] *See* Exhibit F, NBC News, *Crematory operator gets 12 years in prison; See also,* Noble Podcast, *supra.*
[25] Counsel was unable to identify which or how many counts to which Mr. Marsh pleaded guilty.

the future. Indeed, he has been employed since he was a teenager, but not until 2019 did he engage in a single act of fraud.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[26] However, Mr. Hallford *will* be specifically deterred by two factors. First, pursuant to conditions of his supervised release, he is prohibited from engaging in "occupation, business, profession, or volunteer activity that would require or enable you to be involved in the funeral, cremation, burial." Second, even after his term of supervised release, given the nation-wide media attention received by this case, even if he wanted to, it is unlikely Mr. Hallford would be able to re-engage in mortuary, funeral, and cremation services. He does not, however, want to. Instead, he intends to return to Wagoner, be with his family (including, hopefully, his aging parents), and work at the local Tractor Supply store. He has already contacted that business to ensure they employ individuals with felony records.

This Court should consider Mr. Hallford's actual and implicit inability to commit similar crimes in the future when considering the need for deterrence (or not) here. *See United States v. Olis, 2006 WL 2716048, at 13* (S.D. Tex. Sept. 22, 2006) ("Once Olis returns to his family, the chastening effect of years in prison, the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct."). Mr. Hallford understands that although collateral consequences, such as negative publicity, the loss of his occupation, and loss of family system, are not properly considered *punishment*, they do provide both a specific and general deterrent effect. *See United States v. Morgan,* 635 Fed.Appx. 423, 445.[27]

---

[26] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006).

[27] Unlike in *Morgan,* Mr. Hallford is not proposing that the collateral consequences here *are* a sentence and this Court should, therefore, vary downward.

V.    **A sentence of 180 months will unnecessarily delay Mr. Hallford's ability to take additional reparative steps for his victims.**

Mr. Hallford understands many victim families will not accept any apology he offers and may never be made whole. However, one reparative step this Court should consider is Mr. Hallford's willingness and ability to pay restitution. Spending a significant amount of time in prison only delays his ability to make the necessary restitution payments.

Even if he wants to, imposing financial obligations on Mr. Hallford, while incarcerated, will not allow for much, if any, repayment of restitution. And it will inflict hardship on Mr. Hallford who is, already, financially ruined. If restitution payments are ordered due immediately, Mr. Hallford will be subject to the BOP's Inmate Financial Responsibility Program ("IFRP"). This program is technically voluntary, but opting out carries substantial punitive consequences. If an inmate has a financial obligation and opts-in to the IFRP, BOP program statement 5380.08 delegates to the unit team at the place of incarceration broad discretion in setting the minimum payments expected per month. Those payments generally derive from an inmate's prison wages. For inmates who are allowed to work in UNICOR, which generally offers the highest-paying prison jobs, pay ranges from $0.23 per hour to $1.15 per hour.[28]  For inmates who do not participate in UNICOR, pay rates range from $0.12 per hour to $0.40 per hour.[29]

Unit teams who administer the IFRP program are directed to set aside $75.00 monthly in the account for phone use. Any money remaining after the $75.00 is set aside "may be considered for IFRP payments," regardless of whether the money is in the inmate's trust fund or phone credit

---

[28] BOP website, UNICOR Program details,
https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp#:~:text=UNICOR%20progra ms%20help%20reduce%20recidivism,contribute%2050%25%20of%20their%20earnings. Mr. Hallford intends to request designation at a facility that has UNICOR programming.
[29] BOP website, Work Programs,
https://www.bop.gov/inmates/custody_and_care/work_programs.jsp#:~:text=Sentenced%20inm ates%20are%20required%20to,hour%20for%20these%20work%20assignments.

account. The consequence of this policy is that, but for $75.00 per month, an inmate subject to IFRP is subject to garnishment of all funds. Many of those funds are for necessities.

For example:

- Inmates must pay a $2.00 fee for health care services, per health care visit, for health care services received in connection with a sick call;[30]

- Inmates must purchase over-the-counter medications through the commissary with their personal funds;

- Inmates must purchase many essential products, including soap, deodorant, toothpaste, mouthwash, toothbrushes and shampoo; and

- Inmates must purchase clothing items beyond the basic items issued by the camp. These items include shower shoes, socks, sneakers, underwear, pajamas, sweatpants, and sweatshirts.

Opting out of the IFRP program does not alleviate these problems. The consequences of declining to participate in IFRP include:

- Mr. Hallford would not be eligible to work in higher-paying UNICOR jobs;

- Mr. Hallford would be subject to a monthly commissary limitation of $25.00 per month;

- Mr. Hallford would not be eligible for placement in a community-based program; and

- Mr. Hallford would not be eligible to receive First Step Act earned time credits.

In other words, the repayment of restitution in full, something Mr. Hallford intends and desires to do, is virtually impossible while incarcerated.[31] He will not be able to earn enough money in prison to meaningfully reduce any restitution amount until his release. And ordering restitution payments to begin immediately will jeopardize his ability to focus on rehabilitation by limiting his means of communicating with family members and potentially denying him basic human necessities like soap and healthcare.

---

[30] BOP Program Statement P6031.02, https://www.bop.gov/policy/progstat/6031_002.pdf.

[31] For those same reasons, Mr. Hallford requests a special instruction ordering that "payment of criminal monetary penalties shall not be due during the period of imprisonment."

VI.    **Mr. Hallford accepted responsibility for his crimes from the outset and has never waivered in his desire to bring Return to Nature families closure.**

Mr. Hallford was indicted for the federal fraud offenses in April 2024. Then, despite having been granted bond in the related state case, he was ordered detained. From the beginning, Mr. Hallford expressed remorse and the desire to plead guilty, in part, to spare RTN victim families the pain of protracted litigation and trial. Despite voluminous discovery and complex legal issues, Mr. Hallford notified this Court of his intent to plead guilty just five months after his arrest.

Despite the risk of a significant sentence (now, five years longer than the maximum sentence anticipated at the time he entered his plea of guilt), Mr. Hallford has been steadfast in his accepting and apologetic stance. Mr. Hallford was mindful that withdrawing from his plea agreement, considering the increased possible penalties, would undermine his acknowledgment of fault and might revictimize the victim families in this case by implicitly denying responsibility. His willingness to acknowledge fault, accept responsibility, and make reparations (where appropriate) is particularly important in a case involving victims. Prominent "restorative justice" models underscore this need for "(1) [an] implicit or explicit acknowledgement of fault and (2) an apologetic stance on the part of the offender, ordinarily conveyed through having him undertake a reparative task."[32]

VII.    **Conclusion.**

As Mr. Hallford enters prison for the first time ever in his life, he will, as he has for the past two years, think daily of the families he harmed by his deceit. None of those thoughts, no reparative efforts, and no sentence, will undo the harm caused by Mr. Hallford's fraud. The role of this Court is to decide what sentence might be "sufficient," if imperfect, but also not greater than necessary. In undertaking that task, this Court must consider the circumstances that led to Mr. Hallford's fraud, his anticipated sentence in El Paso County, the already-aggravated range provided by the Sentencing

---

[32] John Braithwaite, Principles of Restorative Justice, *Restorative Justice and Criminal Justice: Competing or Reconcilable Paradigms,* (von Hirsch, Roberts & Bottoms Eds., 2003).

Guidelines, and sentences imposed for fraud cases generally, fraud cases outside the "heartland" of fraud, and cases involving similar conduct. In consideration of each of those factors, and the other factors this Court must consider pursuant to 18 U.S.C. § 3553(a), the appropriate sentence is 120 months.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
laura_suelau@fd.org
Attorney for Defendant Jon Hallford

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I filed the foregoing **_Defendant's Sentencing Statement_** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Craig Fansler, Assistant United States Attorney
Email: craig.fansler2@usdoj.gov

Tim Neff, Assistant United States Attorney
Email: tim.neff@usdoj.gov

Robert C. Melihercik
Email: chaz@meliherciklaw.com
Attorney for Carie Hallford

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Jon M. Hallford (via U.S. Mail)

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
laura_suelau@fd.org
Attorney for Defendant Jon Hallford