IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 24-cr-00113-NYW

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JON M. HALLFORD,

    Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT JON HALLFORD'S SENTENCING STATEMENT [#108]**

---

The Government respectfully responds to defendant Jon Hallford's Sentencing Statement, in which he requests a 120-month (10 year) imprisonment sentence. *Def.'s Sent. Statement* at 1 [#108]. In response, the Government persists in its request for a 180-month (15 year) imprisonment sentence for the following reasons:

    *1. State Court Prosecution Does Not Warrant a Lighter Federal Sentence*

The Defendant argues that because he is facing a future sentencing date on state charges involving abuse of corpse, "this Court should focus on the federal crime at issue here, fraud." *Def.'s Sent. Statement* at 3. Put differently, the Defendant urges the Court to leave to state authorities the responsibility of addressing the Defendant's conduct involving the desecration of loved ones' remains and the emotional destruction

it left in its wake.

The Defendant's argument has two primary flaws:

First, the Defendant's flagrant mistreatment of corpses is at the core of the conduct before the Court for its consideration.   Grieving family members came to the Defendant at a moment of vulnerability and gave him their trust, and the Defendant lied to 190 families, one after another, despite knowing about the worsening condition and desecration of the bodies at Penrose.   His willingness to propound the lies despite his full knowledge of what was happening to the bodies after the family members entrusted their departed loved ones to his care makes the present federal fraud offense egregious and central to the facts the Court should consider.   Even if the statutory label for the present offense of conviction reads "conspiracy to commit wire fraud," the undisputed facts set forth within the PSR (and parties' plea agreement) leave no doubt that "relevant conduct" for the present offense includes his mistreatment, abuse, and violation of corpses--190 bodies to be exact—after lying to the family members that he would treat the corpses with dignity.   For example, some of the details of this relevant conduct is provided within the PSR as follows:

- The HALLFORDS attempted to conceal their fraudulent activity by allowing the 190 bodies to remain in various states of decay and decomposition within the Penrose location in Penrose, Colorado. The HALLFORDS concealed the gruesome collection of bodies at their Penrose location by preventing outsiders from entering their building, covering the windows and doors of the building to limit others from viewing inside, and providing false statements to others regarding the foul odor emanating from the building and the true nature of the activity occurring inside.   PSR ¶ 23

- There were bodies located in every room, including the bathroom, of the 2,500 square foot single story building, except for the utility room. Many bodies were in disposable body bags, body bags used by local coroners, and some were wrapped in sheets with duct tape. Some bodies were exposed with no covering at all. Some bodies were on gurneys, and some were laying on the floor, stacked up. There were some children recovered, and a fetus was also enclosed in a bag with other bodies. As many of the decomposition fluids leaked out of the bags, five-gallon buckets had been placed in various locations to collect the leaking fluids.   The investigators experienced physical and emotional duress and had to wear layers of protective gear as they walked through several layers of human decomposition.   PSR ¶ 48.

- Many areas of the building were initially inaccessible due to the bodies being stacked high. None of the three refrigerators were functioning properly with some bodies stacked in front of the ajar door. Investigators recovered lye (which can be used to dissolve a body), bug bombs, large baking soda containers, and Febreze containers.… A bone grinder was located with a bag of Quikcrete concrete mix next to it, which investigators believed to be used along with another substance to fill urns.PSR ¶ 49

- A review of surveillance cameras that were located on the property revealed an incident on September 9, 2023, in which JON HALLFORD entered the building with a body on a cart. The interior camera shows multiple deceased bodies in the room with one on a gurney. JON HALLFORD dumped the body on the gurney to the floor and wiped down the decomposition from the gurney onto the other bodies in the room, as that specific gurney was needed. PSR ¶ 51

Indeed, a bedrock principle of the federal sentencing guidelines is that all relevant conduct is to be taken into account as part of the offense conduct at sentencing.   See USSG § 1B1.3.   Put simply, the Court has a responsibility to address the Defendant's mistreatment of corpses at sentencing and should not abdicate its duty

under the guidelines and the federal sentencing statute, 18 U.S.C. § 3553(a) because state charges may implicate similar conduct.

Second, as a practical matter, the Defendant is requesting that the Court ignore conduct which is properly before it and instead defer to a state judge's judgment at a future sentencing date.   However, doing could result in a miscarriage of justice as any number of unforeseen factors could impact the future sentencing outcome in state court. For example, the Defendant could be allowed to withdraw his plea of guilty to state charges, thus allowing the Defendant to escape liability for his conduct; the Defendant's presentence report in state court may not fully address and include facts presented within the federal PSR, thus giving the state judge an inadequate and deficient record to consider at sentencing; the Defendant's state sentencing could be delayed for a protracted period of time, thus depriving the victims of a closure and timely resolution of the case; and the state judge could evaluate the facts of the Defendant's conduct wholly inconsistent with federal law, federal sentencing factors and other unique facts associated with the federal case, thus resulting in a outcome (such as a substantially lower sentence) not anticipated by the Court.

In sum, the nature and circumstances of the Defendant's present offense involved the desecration of bodies.   The Court should consider the Defendant's continuing abuse of corpses that grew worse and worse by the day and was occurring at the same time he was continued to sign up new victims.

### 2.  The Defendant's Unwarranted Disparity Analysis is Flawed

The Defendant argues that a sentence greater than 120 months would create an unwarranted sentencing disparity when compared with even the most aggravated fraud defendants. *Def.'s Sent. Statement* at 13. In support of her position, the Defendant cites as examples the lengthy prison sentences imposed by courts in high-profile federal prosecutions against Elizabeth Holmes (market and investor fraud – 135 months prison), Robert Menendez (political corruption fraud – 132 months prison), and Jennifer Shah (investor and tax fraud – 78 months prison).

When conducting its disparity analysis, 18 U.S.C. § 3553(a)(6) instructs the Court to concern itself with "defendants with similar records who have been found guilty of *similar conduct.*" *Id.* Here, the Defendant citation to the above cases is inapposite as the fact patterns from such cases do not involve "similar conduct". While all of the above referenced defendants committed fraud offenses which were undoubtedly aggravated, the similarity with the present case stops there. The conduct of the Defendant in the present case was different in numerous ways. For example, here the Defendant: (1) operated a funeral home and preyed upon numerous grieving family members in their time of personal sorrow; (2) abused and desecrated the remains of 190 individuals; (3) caused untold emotional damage and trauma due to extreme cruelty, callous behavior and the ultimate abuse of trust; and (4) fraudulently obtained close to a million dollars in Covid relief funds which were then misapplied and never used to rectify the horrendous conditions existing at his funeral home. None of the three defendants referenced above engaged in conduct remotely similar to the

Defendant's conduct. Therefore, considering these three cases is unhelpful when conducting a disparity analysis in the present matter.

The Defendant cites several other cases in connection with his disparity argument. The Defendant references *United States v. Rathburn*, in which the defendant received a 108 month imprisonment sentence after he was convicted of wire fraud and illegal transportation of hazardous material. 771 Fed. Appx. 614, 618 (6th Cir. 2019) (unpublished). Rathburn's offense involved providing unsuspecting medical professionals with human bodies and body parts for training purposes that tested positive for HIV and hepatitis B. *Id.* at 619. Despite Rathburn's explicit assurances to his customers, he obtained anatomical specimens that tested positive for infectious diseases for discounted prices and supplied them to his customers, while concealing the positive test results. *Id.*

In *Rathburn*, the victims were third party medical professionals who unknowingly purchased contaminated specimens in the open marketplace. Here, the Defendant's victims were the numerous families who had paid for a cremation or burial for a loved one but never received such services. Compared to *Rathburn*, the harm to the victims in the present case was more personal, more direct, and more traumatic as it involved the mistreatment of a loved ones' remains. In *Rathburn*, families had already relinquished the bodies for medical purposes to various vendors and before the defendant recklessly handled the remains when dealing with customers at a later date. In the present case, the victims paid for a cremation or burial for a family member only

to later learn in devastating fashion that their family member had been left to rot in an undignified manner. Thus, the facts in *Rathburn* are distinguishable from the present case making it of limited value when conducting a disparity analysis.

The Defendant also cites to the State of Georgia's prosecution against Ray Marsh in 2002, in which Marsh abandoned 334 bodies at his crematory.[1] Similar to here, Marsh provided some of the families with concrete dust instead of ashes. Marsh was sentenced to 12 years imprisonment on state charges including theft and abuse of corpse. Because Marsh's case involved state offenses, it's difficult to conduct a meaningful disparity analysis. When sentencing Marsh, the state judge would have applied Georgia sentencing factors, Georgia sentencing statutes, and a Georgia sentencing rubric all of which do not correspond with the federal ones at play here. At most, Marsh's sentence simply highlights the fact that a state court when faced with a similar set of facts as here, imposed a decade-plus sentence to an offender who violated both the law and society's sacred norms while operating a funeral home.

Finally, the Defendant attempts to distance himself from the facts in *United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024), where on remand, the district court once

---

[1] The Defense provided a news article outlining the facts of the Marsh case. *Def.'s Sent. Statement, Exhibit F*. The Government was unable to locate any official reported criminal case on this matter. However, the basic facts from the news article were confirmed by the Government based on related civil cases. *See Akers v. Prime Succession of Tennessee*, 387 S.W.3d 495 (Tenn. Supreme Court 2012) and *Floyd v. Prime Succession*, 2007 WL 2297810 (Tenn. Court of Appeals 2007) (unpublished).

again imposed a 240 month imprisonment sentence on Hess and a 180 month sentence on her mother for wire fraud.[2] Over the course of their scheme, the defendants falsely represented to numerous customers that they were providing a cremation or burial for the victims' loved ones when in fact they were often selling the bodies and body parts to others. Among other things, the Defendant argues *Hess* is different because the defendants were never charged by the state authorities with abuse of corpse like him, and because the fraud in *Hess* involved several hundred more victims and occurred over an eight-year span as opposed to four here.

Despite these differences, the similarities between the two cases remains notable. As set forth in the Government's Sentencing Statement, "Like in *Hess*, the Defendant betrayed all trust which families placed in him to properly handle the remains of loved ones in a dignified manner. Instead, the Defendant and his wife defiled and disrespected the remains of loved ones, deceived the families by providing concrete mix rather than actual cremains, and carried out their cruel conduct for a four year period." *Id.* at 14. Similar to the defendants in *Hess*, here the Defendant's conduct lasted for multiple years and was only stopped because law enforcement arrested him. Absent law enforcement intervention, there is no indication that the Defendant was preparing to end his scheme and cease operating his funeral home.

---

[2] On April 21, 2025, Judge C. Arguello conducted the resentencing hearing in *Hess*. *See U.S. v. Megan Hess and Shirley Koch*, case no. 20-cr-00098, (Dist. Colo.) [ECF #s 428 and 436].

In sum, *Hess* provides the Court with one similar case for comparison when conducting its disparity analysis pursuant to 18 U.S.C. § 3553(a)(6). Short of *Hess*, however, finding comparable federal cases is difficult if not futile, which emphasizes the egregious nature of the Defendant's crimes.

*3. Guidelines Do Not Capture the Aggravated Nature of the Underlying Crime*

Finally, the Defendant argues, among other things, that "it is critical to consider that his applicable guideline range already captures the aggravated nature of the case…" *Def.'s Sent. Statement* at 13. (emphasis in original). He maintains that his applicable offense level of 28 accounts for the harm caused to the victims and to the community. *Id.* at 11-12.

However, the Defendant's request for a 120-month sentence—a sentence 2 years above the top end of the applicable guideline range—is an acknowledgement that this is not an ordinary case warranting a within guidelines sentence. Instead, his offense conduct falls outside of the heartland of routine fraud cases and justifies a substantial prison sentence beyond what is recommended by the guidelines.

Here, the Government agrees with the Defendant's request that the facts in this case warrant a sentence which exceeds the top end of the guideline range but simply disagrees about the gravity and aggravated nature of his conduct.

//

//

The Government continues to request a 15-year imprisonment sentence based on the reasons and arguments set forth in its previously filed Motion for Upward Departure and/or Upward Variance. [#90].

Respectfully submitted this 12th day of June, 2025.

        J. Bishop Grewell
        Acting United States Attorney

        By:  *s/ Tim Neff*
        Tim Neff
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0100
        Fax: (303) 454-0405
        E-mail: Tim.Neff@usdoj.gov
        Attorney for the Government

        By: *s/ Craig G. Fansler*
        Craig G. Fansler
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0100
        Fax: (303) 454-0405
        E-mail: Craig.Fansler2@usdoj.gov
        Attorney for the Government

## CERTIFICATE OF SERVICE

I certify that on this 12th day of June, 2025, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT JON HALLFORD'S SENTENCING STATEMENT [#108]** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

By: *s/Maureen Carle*
    Legal Administrative Specialist
    United States Attorney's Office